Filed 7/11/24  P. v. Potter CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER POTTER,<br><br>    Defendant and Appellant. | B319107<br><br>(Los Angeles County<br>Super. Ct. No. MA077627) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Affirmed in part, reversed in part, and remanded with directions.

William P. Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Shezad H. Thakor, Jason Tran, and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Christopher Arland Potter appeals from his judgment of conviction for count 1, conspiracy to commit murder (Pen. Code,[1] §§ 187, subd. (a), 182), and count 2, first degree attempted murder (§§ 187, subd. (a), 664). The jury also found true each count was committed to benefit, promote, further, and assist a criminal street gang (§ 186.22, subd. (b)(1)(C)) and the offenses were committed in state prison (§ 1170.1, subd. (c)).

Potter makes various challenges to his conviction. First, Potter asserts the trial court improperly limited his cross-examination and impeachment of the prosecution's primary gang expert and investigator regarding a complaint lodged by the gang leader against the expert. Second, he argues the trial court erroneously admitted a hearsay statement that the gang's leader ordered the murder of a former member of the gang. Third, he argues the trial court improperly limited his cross-examination of that former member's motivation for participating in another murder, specifically, whether the attack was financially motivated and conducted for reasons unrelated to the gang, which resulted in the former member's expulsion from the gang. Fourth, Potter argues the evidence was insufficient to support the jury's true finding on the gang enhancement because the predicate offenses no longer met the amended requirements under Assembly Bill No. 333 (2021–2022 Reg. Sess.) (AB 333). Fifth, he argues the trial court improperly erred in applying a 10-year enhancement for the gang enhancement under section 186.22, subdivision (b)(1).

---

[1] All further undesignated statutory references are to the Penal Code.

2

On his first two challenges, we find any error was harmless beyond a reasonable doubt as the evidence of Potter's guilt was overwhelming.  With respect to his third argument—whether the trial court erred in limiting his cross-examination of the former gang member—we find the trial court properly exercised its discretion as Potter's counsel lacked a good faith belief to further question him about any alternative motivation for attacking another inmate.  Regarding his fourth and fifth challenges to the sufficiency of the evidence in support of the jury's true finding on the gang allegations, we agree with Potter.

For these reasons, we affirm in part and reverse in part the judgment, and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Prosecution evidence

#### A.  The Northern Riders

Maurice Vasquez founded the Northern Riders in 1999 and is the gang's current leader.  "Northern" has since been dropped from the gang's name, and the gang is now known as the "Riders."  While the Riders primarily operate in facilities within the California Department of Corrections and Rehabilitation (CDCR) system, they are considered a street gang.  The Riders' primary criminal activities are pimping, illegal drug sales, robbery, assault, and battery.  Members identify themselves using the terms "Compa," "Compadre," "Riders," and "Rider" and have adopted the Playboy Bunny logo as a symbol.

Vasquez is known as the "Playboy President."  He established the Riders by breaking from the Nuestra Familia, a Northern California Hispanic street gang, operating within CDCR's general population.  Vasquez recruited other individuals,

who no longer wanted to be governed by the rules and regulations established by the Nuestra Familia.

CDCR segregates Riders from its general population inmates by placing them on sensitive needs yards (SNY's), which are used to segregate individuals who have dropped out of general population gangs. Although SNY's are not supposed to contain active gang members, SNY gangs, such as the Riders, are eventually formed with general population gang dropouts. A "Riders compound" is a CDCR facility that houses Riders, and conforms to the Riders' rules and regulations.

Vasquez drafted a document known as the "Compadre Concepts and Objectives" (CCO's), which describes the Riders' history, structure, and rules. The CCO's prohibit any kind of split within the Riders, stating " 'at no time will there ever be a divide within the Rider movement.' " Indeed, forming a splinter faction is considered a blatant violation of the CCO's and punishment for doing so includes murder.

Alexander "Scrappy" Diaz, a former Rider and the victim in this case, formed such a splinter faction known as the Nuestra Compas. The Nuestra Compas is now known as the Nuestra Cosas. It was well known amongst Riders and within Riders compounds that Diaz betrayed Vasquez in forming the Nuestra Cosas.

Various documents related to the Riders were found in Vasquez's cell. One document titled, "A Missive Concerning Current [E]xisting Issues On The Compounds," and signed "[L]oyally Committed To The Prosperity Of The Rider Movement, The Playboy President," was entered into evidence and it contained the following excerpts.

"There will never be a divide within the Rider movement. We have a zero tolerance policy towards actions concerning subsets, subgroups or offsets of our movement. Recently in [Kern Valley State Prison] there was some nonsense transpiring where compas were identifying themselves as FAS, going as far as tattooing it on them. I sent a personal emphasis to them to cease such controversial behavior and provide one warning for them to cover any tattoos of that crap or it would be fucken cut off of them. The compas delivering the warning were committed to executing extreme violence upon any individual who chose to disregard the compadres commands to terminate such contradictory behavior. The compas who were involved in the shenanigans all immediately obliged. We shall never condone, tolerate, accept, nor support contrary behavior."

"If any entity puts us in a position where we feel challenged, we declare war, plan, prepare and execute the attack wherein we will slaughter our target. That's the Rider way of warfare."

Another document was titled "An Epistle Pertaining To The Prosperity of The R.I.D.E.R. Movement" dated December 31, 2016, and was signed by Vasquez as " 'The Playboy President.' " The following excerpts were read to the jury.

"The infestation of imposters running around like a bunch of lowlife, lawless hooligans were practicing and promoting false propaganda. They were convincing the imposters to believe—to believe we're the Northern Riders. Yet, [were] just some made-up gibberish that was falsely fabricated and filtered by [the] lawless little homosexual snitch named Alexander Diaz. . . . [¶] . . . [¶] — who also goes by the several aliases such as Scrappy Diaz, Tiny, Shorty, and Midget. The little jailhouse schmuck first came to

[CDCR] in 2011 from [the California Youth Authority] and was in Tehachapi in IYP . . . until he turned 18 and was sent to [CDCR]'s first SNY in Mule Creek in 2001. [¶] He paroled in 2003, and shortly after was charged with murder of a 15-year-old kid wherein he testified against all his co-defendants from Varrio Meadow Fair in San Jose. [¶] The little faggot has never stepped foot on the mainline and has absolutely nothing to do with founding the Rider movement. What he is responsible for, however, is promoting contradictory behavior under the shield . . . [¶] . . . [¶] —of the glorious Rider movement. He is responsible for all the contrary conduct that was occurring in the PC yards from 2001–2003. While the certified compadres were on the mainlines of [Pleasant Valley State Prison] . . . a yard, Susanville-Lassen yard, Corcoran 3B, and [High Desert State Prison] . . . D yard. [¶] . . . [¶] Guarding and protecting our territory at the time."

"Now mind you, the reason for CDCR's attempt to validate the Rider movement as a prison gang was not . . . as a result of what [Vasquez] and his playboys were doing in 2004, but due to the secret code word . . . . [¶] . . . [¶] Malicious malarkey that faggot Scrappy and her homosexual homegirls were doing on the PC yards. Safe out of . . . harm's way. The first and only time [Vasquez] ever encountered this little prison punk was in Ad Seg law library wherein he instructed . . . [Diaz] to sign off his SNY chrono so he could transfer to High Desert."

"That little queer Scrappy went to Tehachapi where he infiltrated as a buster and got his dumb-ass validated as a structure associate which is why he had to debrief in the [Transitional Housing Unit] in [Kern Valley State Prison]. [¶] . . . [¶] Unbeknownst to [Vasquez], he was never going to

finally pulverize this little pussy as he has been eagerly anticipating due to Scrappy having his 812.[2]  [¶] . . . [¶] [Vasquez] was made aware of this while in [Kern Valley State Prison] Ad Seg for demolishing some pcs on D yard with some of his compadres.  The reason I'm even elaborating on this . . . is due it to being essentially to defining a . . . line of clarification by emphasizing that anyone who has been . . . deceived to believe this little rat was in any way whatsoever involved in any of what transpired during the tremendous tenacity it took to conquer and surmount the arduous obstacles that were constantly encountered during the introduction of the Rider movement to the prison system.  You have your calculation profoundly miscalculated."

Another document found in Vasquez's cell was a purported "hit list."  The list contained the names of numerous inmates, their location, and inmate number.  Diaz was on the list.

### B.     Potter

Potter is a member of the Riders and is one of Vasquez's 18 "disciples."  Potter is known as "Blanco" and is considered the "son" or "godson" of Vasquez.  Potter was the only known Rider who could countermand Vasquez's orders.

### C.     The conspiracy to murder Diaz

On April 2, 2019, Diaz was transferred to Corcoran State Prison (Corcoran).  At the time, Potter was housed at Corcoran with other Riders, including Michael Kons, Andres Cordova,

---

**2**      An "812" is a CDCR form that is filled out by inmates to notify prison officials when another prisoner is their enemy.  If an inmate lists another inmate on an 812 form, those inmates are not supposed to be housed together.

Anthony Bojorquez, and Witness Number Five. Witness Number Five later testified under an immunity agreement with the prosecution.

When Diaz arrived at Corcoran, Potter received a "wila" or "one-time," from another inmate, who delivered it on behalf of Diaz. A "wila" or a "one-time" is an inmate-authored note that is delivered from prison to prison. The note contained a money order from Vasquez to Diaz and a phone number for Potter to call to make sure Diaz was approved to be on the Corcoran yard with the Riders.

On April 10, 2019, Potter called Michelle Bravo, Vasquez's "secretary." Gangs operating within a CDCR facility may use a "female facilitator" or "secretary" to assist them in conducting criminal activity and to communicate with inmates at other CDCR facilities. The call was recorded and played for the jury. The conversation proceeded as follows:

"Potter: Alright. I'm good. Have you talked to [Vasquez]?

"Bravo: I'm waiting on his call . . . it should be kinda [*sic*] between now and the week.

"Potter: Ok. And you got everything that I told you last time down?

"Bravo: Yeah. Yeah I did. S[o] um, do you have any word on [Diaz]?

"Potter: He's right here.

"Bravo: Okay, so what's goin [*sic*] on with that?

"Potter: That's what I need to know. Ok. Listen, I got a one-time and that's how I got your number so all that got squashed. It's all good for him from what I know. That's why I've been waiting. You know what I'm saying? [¶] . . . [¶] So, whoever, so, but it's, that's all squashed. It's a stand down. And

8

uh, he's right here.  He's on orientation.  He came with a couple things for me.  That's, you know what I'm saying?

"Bravo:  Yeah.  So it's proved then?

"Potter:  Huh?

"Bravo:  It's been proven?  It's been proven then that he's.

"Potter:  Absolutely.  I know, I know, I know his writing.  Right?  [Vasquez]?  I know his writing.  And it's his.  It even had something in there for me.  Had this number.  Every other, every other thing that I had.  Yeah, and it's . . . .  And, a lot of other people were like 'Ok' but I had to tell them that's it.  That he did that.  That's it.  There's no . . . you can't, you can't, there's nothing else you can do about it, you know what I'm saying?

"Bravo:  Ok.  So is everybody getting on board with that?  Because I spoke to. . . .

"Potter:  It doesn't matter.  That doesn't matter though.  That doesn't matter.  He did that.

"Bravo:  No, I mean, do they know?  Do they know?  Because he's asking if they know?

"Potter:  Right here?  Right here?

"Bravo:  Yeah.

"Potter:  Everybody, a couple of people at first like ehhh . . . but everybody's on board, and uh, it's alright.  Everything's good.  You know what I'm saying?  There isn't really, there isn't really nothing that nobody can say.  Because when he said he had something for . . . when he had said . . . from him.  I said let me see it?  And I already knew the writing.  And it's like . . . and then it had something for me in there.  And that's . . . you know what I'm saying?"

On May 8, 2019, Vasquez called Bravo from Lancaster State Prison.  During the call, Bravo informed Vasquez she had

spoken to Potter, who had confirmed his receipt of the note from [Diaz]. Bravo told Vasquez, "Everybody is kinda [*sic*]upset because I'm like [Diaz] is good, [Diaz] is saying he's good. [¶] . . . [¶] And so is [Potter]. [Potter] is saying yeah, he said I'm here on the yard with him right now, he's with me, it's good." Vasquez responded, "No, not at all . . . . Tell them that they need to understand to disregard that, disregard that. Tell them if it's not coming from me directly, disregard that. Tell them what the fuck are they thinking?"

Vasquez then asked Bravo to call Potter's secretary, Abigail "Chula" Valencia while he remained on the phone. The following colloquy took place:

"Vasquez: Tell them I said, they should know better.

"Bravo: Ok.

"Vasquez: Don't you ever assume that, that would ever happen.

"Bravo: Ok.

"Vasquez: Tell them that would never happen. Ok?

"Bravo: What would never happen?

"Vasquez: That bitch Alexis, that bitch Alexis being ok.[3]

"Bravo: Ok, ok.

"Vasquez: She is not cool.

"Bravo: Ok.

"Vasquez: She's in the exact same predicament as she's always been.

"Bravo: Ok perfect, perfect.

"Vasquez: Ok listen to me that was all nonsense. They need to disregard any of that. Let look it listen to me, let Chula's

---

[3]    Alexis refers to Diaz.

dude know, this is very important baby.  Let Chula's dude know, let Chula's dude know that his Pops, his Pops said.

"Bravo:  Yes?

"Vasquez:  His Pops said that, that chick Alexis.

"Bravo:  Yeah.

"Vasquez:  That bitch has, that bitch has a stay away order."

"Vasquez:  Hey Chula.

"Bravo:  She's on the phone.

"Vasquez:  Very very low, . . . speak up Chula.  I can't even fuckin hear her.

"Bravo:  Chula can you speak up?

"Valencia:  I can hear him.

"Bravo:  Ok what do you want me to tell her?

"Vasquez:  Ok tell her that her dudes dad.

"Bravo:  Ok her dude's dad, yeah.

"Vasquez:  Tell her, . . . her dude's dad said that that [fuckin'] chick Alexis cannot be on the fuckin property.  She can't be on the property.

"Bravo:  Did you hear that Chula?

"Vasquez:  Did she hear me?

"Valencia:  No.

"Bravo:  Ok he's saying that, that chick Alexis cannot be on the same property as your dude.  Could you tell him that?

"Valencia:  Ok, he's [on] C Status right now.

"Vasquez:  Ok listen to me.

"Bravo:  He's on C Status.

"Vasquez:  What?

"Bravo:  He's on C status right now.

"Vasquez:  Ok well, does he call her?

11

"Bravo:  Does he call you?

"Valencia:  No he don't, but he has people call me.

"Bravo:  No he has people call her.

"Vasquez:  Ok listen to me, who does he have call her?

"Bravo:  Ok, who does he have call you?

"Valencia:  I don't know he has cellies.

"Bravo:  His celly?  Does he give you a name?

"Vasquez:  Ok well listen, whenever he, whoever calls him, whoever calls her, needs to understand that bitch Alexis cannot be [¶] . . . [¶] on that property.

"Bravo:  Ok could you tell him that Chula?

"Valencia:  Yeah I can.

"Bravo:  Ok thank you.

"Vasquez:  Look it, at all, tell him he should [fuckin'] know that.

"Bravo:  Ok.

"Vasquez:  Tell him he should know that.  Tell her to tell him she should fuckin know that.

"Bravo:  Shit ok so I'm going to call.

"Vasquez:  He should know that.

"Bravo:  Primo so you could tell him that.

"Vasquez:  Ok listen.

"Bravo:  Yeah.

"Vasquez:  Do you have Primo's [girl's] number?

"Bravo:  No but I have.

"Vasquez:  Huh babe?"

Bravo then called Joshua "Primo" Simmons while Vasquez remained on the line.[4]

---

[4]    Simmons was an active member of the Riders at the time.

"Bravo:  I have his hold on, can you hear anything is the phone ringing?

"Vasquez:  Who's this?  Yeah who is this?

"Bravo:  I'm calling Primo.  Ok.

"Vasquez:  Where's Primo at, same area?

"Simmons:  Hello?

"Vasquez:  Same area?

"Bravo:  Primo's right here can you hear him?

"Vasquez:  Hey Primo.  Primo?

"Simmons:  Hey who's this?

"Vasquez:  Hey what's up playboy?  Ok listen to me this is very important I only got a couple minutes nigga.  Listen to me.

"Simmons:  Who is this?

"Vasquez:  Playboy.

"Simmons:  Who is this?

"Bravo:  The author, the author.

"Vasquez:  Nigga you know who this is nigga, listen to me playboy listen to me nigga.  Mother fuckers cannot be that damn goofy to believe that that bitch Alexis is allowed to be stepping on the mother fucking property nigga.  Are mother fuckers really that stupid?  Are mother fuckers really that stupid?

"Simmons:  Well look it, look it I already know that ok but I was told something different ok.

"Vasquez:  I know but listen to me.

"Simmons:  Wait a second.

"Vasquez:  Ok listen never, never, never, never.  Listen you know Blanco's dad right?

"Simmons:  Right.

"Vasquez:  Blanco's pops, you know Blanco's pops?  Blanco's pops?

13

"Simmons: Yeah.

"Vasquez: Ok Blanco's pops said to disregard everything that that [h]o is talking about. That bitch can't be over there working at the club bruh. Aren't mother fuckers smarter than that? That bitch can't go over there with no recommendation to work at the club nigga. That's all game that was all game playboy. Mother fuckers are out of their minds. Don't they realize that that was all game nigga? You got to be kidding me. That bitch can't work there. Every nigga, listen to me that club will, listen to me this is very important that club will lose their license if that bitch is anywhere on that property bruh.

"Simmons: I'm already knowing. I'm already knowing. I'll take care of it.

"Vasquez: You know what's crazy?

"Simmons: I'll make sure it's taken care of by the end of.

"Vasquez: Ok look it.

"Bravo: It'll be taken care of.

"Vasquez: In the thing, in that book listen to me nigga in that book it says that her circumstances are still the same. Her circumstances have not changed nigga. Mother fuckers got to get their shit together, niggas are out of their fuckin mind playboy, [they're] out of their mind.

"Bravo: But.

"Vasquez: [They're] out of their mind.

"Bravo: The son.

"Vasquez: Tell them niggas I said step their fucking game up. Step their fucking game up."

On May 8, 2019, Potter, Witness Number Five, and Bojorquez called Vasquez with a contraband cell phone from Potter's cell. Vasquez told Witness Number Five, " 'It's time to

14

shine and time to take care of business and see how loyal you are to me.'" Witness Number Five responded, "'Okay. I will do what I got to do'" and "'I'm always loyal to you, compadre.'" Witness Number Five understood Vasquez's statement as an order to attack Diaz.

On May 9, 2019, Potter, Kons, Witness Number Five, and Cordova met in the yard for a "Compadre Committee." Potter led the others in a discussion of how they would attack Diaz. Bojorquez and Cordova were assigned to help Witness Number Five assault Diaz on the yard. Witness Number Five's instructions were to "stomp [Diaz] out and kill him" or at least cause great bodily injury if possible.

### D.     The attempted murder

On May 10, 2019, the day of the attack, Witness Number Five was working out with Diaz on the yard. Diaz showed Witness Number Five an inmate-manufactured wood knife that Diaz secreted on his person.

After working out with Diaz, Witness Number Five went back to his cell. About 45 minutes later, Bojorquez came to Witness Number Five's cell and said Potter wanted him back on the yard. Witness Number Five went back outside to the yard where he met with Potter, Kons, Bojorquez, Cordova, and two other Riders. Potter said it was time to assault Diaz. The group discussed how they were going to attack Diaz, somebody was going to stab him and the others would "finish him." Although it was originally planned that Witness Number Five would stab Diaz, Bojorquez volunteered to stab Diaz, stating "'I'll do it,'" and "'I stab him, and you guys assault him after I'm done.'" The group then went their separate ways with Witness Number

15

Five and Bojorquez moving closer to Diaz, who was still on the yard working out.

After two other inmates started fighting, Potter gave Witness Number Five the " 'go ahead' " signal to attack Diaz. As Diaz was looking towards the direction of the fight, Bojorquez approached him from behind and stabbed Diaz in the back and at the base of his skull and neck. After Bojorquez stabbed Diaz, Witness Number Five started fighting with Diaz. As they fought, Witness Number Five fell to the ground and Diaz stabbed him three times in the back. Diaz said, "fuck Riders," "fuck Snoop," "I'm an N.C.," and "I'm going to kill you." Cordova joined the fight to help Witness Number Five. Kons then ran towards the fight from across the yard and punched Diaz, dropping Diaz to the ground. Witness Number Five, Kons, and Cordova proceeded to kick Diaz while he was down. The fight continued until Potter, who was lying prone nearby, told them to "get down."

Correctional Sergeant Jose Garcia witnessed the attack on Diaz. He testified that two inmates began fighting in another area of the yard just before the attack on Diaz. Cordova ran to assist the inmate fighting Diaz and began punching Diaz. Kons then ran across the yard and began attacking Diaz as well. Diaz fell to the ground and the other inmates continued to punch him.

CDCR investigators responded to the scene. When they arrived, Diaz's attackers were handcuffed and lying prone on the ground. The investigators found a wood knife underneath Cordova that was consistent with the wounds sustained by Witness Number Five, Cordova, and Kons. As Diaz was being treated for stab wounds, the investigators noted his injuries were different in nature from those suffered by his attackers and were consistent with a thin metal weapon like an icepick. Based on

16

the different injuries, investigators opined that the wood knife belonged to Diaz.

Two days after the attack on Diaz, Potter told Witness Number Five, "That bitch got what she got coming."

On June 8, 2019, Bojorquez called Bravo. A recording of the call was played for the jury. During the call, Bojorquez relayed the following message from Potter to Vasquez: "[H]ello it's his son. I can't call myself due to loss of phone, but I got a very important message for him, and others who are part of the Company. I got the message for Chula. He got the message from Chula. Everything went absolutely perfect, Alexis got a ride out of here in a helicopter." Generally, in prison, when someone gets a " 'ride out of here in a helicopter' " it indicates that person suffered such severe or life-threatening injuries that they needed to be transported to a medical facility via helicopter.

In a recorded call between Potter and Valencia, Potter asked her if she spoke with Vasquez. When Valencia indicated she had not, Potter said, "[J]ust let [Vasquez] know that guy is taken care of. That old boy got flighted out in helicopter ok."

During the trial, Cordova and Vasquez were in lockup together. Cordova asked Vasquez for permission to lie to the court and jury, explaining he would take the responsibility for the crime to protect the Riders, specifically, Potter and Kons. Vasquez responded: "Yes. Absolutely, playboy. Go in there. Let them know the [C]ompas had nothing to do with it, that it was you. You can't be harmed anyway. You already took a deal. Let them know that the knife that was found underneath you was not yours. Make sure you let the jury know that. That was not yours, playboy. Let them know that you asked for fingerprints.

Where's the knife that was supposedly this bitch Alexis was stabbed with? Where is it at? That wasn't the knife."

## II.    Defense Evidence

Vasquez testified for the defense. When Vasquez entered prison in 1996, he was a member of the Norteños, a subgroup of the Nuestra Familia. In 1999, after Vasquez was released from custody, he formed the Riders as an alternative to prisons gangs. There are several hundred Riders in CDCR custody while there are several thousand in the streets. The Riders use the Playboy Bunny as their symbol.

Vasquez is the "Playboy President," and author of the CCO's. When someone wants to join the Riders, that individual must go through an "embracement process." Once the individual is certified, the member becomes a "disciple." Riders conduct business by holding a "Playboy Committee," composed of Riders in good standing. A Riders motto is: "We never abandon our fellow Compadre in time of battle." This means, if a Riders member is being overwhelmed in a fight, other Riders must assist him in breaking up or joining the fight.

Vasquez met Diaz in 2004. Diaz was a Rider until he was kicked out of the gang when it was discovered he killed a child during a robbery. Diaz then formed the Nuestra Cosas. In May 2019, Diaz was in bad standing with the Riders.

Vasquez used Bravo to deliver messages. He admitted telling her to relay the message to Potter that Diaz could not be on the Corcoran yard.

While Vasquez had referred to Potter as his "son" in the past, Potter was no longer a Rider as of May 2019.

Kons also testified for the defense. When Kons entered prison in 2001, he was a member of the Northern Crips. Kons

18

joined the Riders in 2015 after he was transferred to a SNY. Kons did not view Vasquez as the gang's leader, but as a mentor, who had a "strong voice" within the Riders.

Kons was transferred to Corcoran in 2016. Kons was confused when Diaz arrived at Corcoran, seemingly with Vasquez's permission to be on the yard with the other Riders because Kons knew that Diaz was from a different gang. Although the Riders at Corcoran argued over whether the note received by Potter was authentic, they ultimately decided the note was from Vasquez, and Diaz would be left alone.

On the day of the attack, Kons saw Cordova running toward a fight between Witness Number Five and Diaz. Upon seeing that Witness Number Five was losing the fight, Kons ran towards them to break it up. Kons thought Diaz might have a knife because Cordova looked scared. After being stabbed by Diaz several times, Kons "dropped" Diaz with a couple of punches. Kons only saw a knife after the fight was over when the investigators recovered the wood knife beneath Cordova.

Kons never knew Potter as a Rider because Potter was "pushed out" of the gang "a long time ago." Kons believed Potter was forced out of the Riders after he was "jumped on in another yard by Riders and told to keep the movement out of his mouth."

Former Corrections Captain and Correctional Counselor William Adams testified for the defense. Adams had investigated numerous gang attacks and murders involving knives. Adams testified it was common to see fist fights between inmates, and that inmate fights are not necessarily planned. However, typically when one gang member is involved in a fight, other members of that gang are expected to assist.

19

If a prison gang conspires to murder an inmate, a common scheme is to greet the victim by hugging him so that other gang members can stab him with inmate-manufactured weapons. This will generally occur in a "blind spot" on the yard where prison staff have limited visibility.

Adams was familiar with the Riders and their conflicts with general population gangs, as well as their presence on SNY's. Adams opined that at the time of the attack on Diaz, Kons was an active member of the Riders, however, he was unable to confirm whether Potter was an active member at the time.

## III.  Jury Verdict and sentencing

An amended information charged Potter and Kons with conspiracy to commit murder (count 1; §§ 182, subd. (a)(1), 187) and attempted murder (count 2; §§ 187, subd. (a), 664).[5] It further alleged both counts were committed in state prison (§ 1170.1, subd. (c)), and were for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The information alleged Potter suffered a prior strike and serious felony conviction.  (§§ 1170.12 and 667, subd. (a).)

A jury convicted Potter of conspiracy to commit murder, and attempted willful, deliberate, premeditated murder, and found the gang and prison allegations true.  Kons was acquitted on all charges.  In a bifurcated proceeding, Potter admitted the prior conviction allegation.

The trial court struck the prior serious felony enhancement, but declined to strike the prior strike conviction or

---

[5]     The original information also charged Vasquez, Bravo, Simmons, Cordova, Valencia, and others.

the gang enhancement. It sentenced Potter to 60 years to life on count 1, composed of 25 years to life, doubled to 50 years to life pursuant to the Three Strikes law, plus 10 years for the gang allegation. On count 2, the trial court sentenced Potter to life with a minimum parole eligibility date of 15 years under section 186.22, subdivision (b)(5). The trial court stayed the sentence on count 2 under section 654.

Potter appealed.

## DISCUSSION

I. **Whether the trial court improperly precluded testimony regarding the prosecution's gang expert's bias against Vasquez**

Potter argues the trial court improperly limited his cross-examination of Luis Chavez, the prosecution's primary gang expert and investigator, on whether Chavez's opinions and investigation of the Riders were motivated by animus towards Vasquez. Potter argues this evidence was highly relevant as Chavez's testimony was integral to the prosecution's case, and the trial court's limitation on his cross-examination violated Potter's Confrontation Clause rights and constituted prejudicial error.

### A. Additional background

As the prosecution's primary gang expert and investigator, Chavez offered various opinions on the Riders and assisted the jury in interpreting the various documents and recorded phone calls related to the Riders and the conspiracy to murder Diaz. To impeach Chavez, Potter sought to cross-examine Chavez about the circumstances of a complaint filed by Vasquez against Chavez for violating CDCR policy.

21

The circumstances of the CDCR complaint involved the seizure and search of a contraband cell phone in Vasquez's possession. According to defense counsel, after searching the cell phone's contents, Chavez found nude pictures of Vasquez's wife on the cell phone and made derogatory comments about her. Chavez also found nude photos of his own girlfriend on the cell phone. Nevertheless, after confiscating the cell phone, Chavez offered Vasquez the use of a landline phone, which was a violation of CDCR policy. Vasquez filed a formal complaint against Chavez for the violation, as well as for the derogatory comments regarding Vasquez's wife. The complaint was not sustained.

In seeking to question Chavez about the complaint, Potter argued the testimony tended to show Chavez's bias and motive to lie about Vasquez and regarding the Riders more generally. Potter's counsel sought to question Chavez about when he began investigating and working towards becoming an expert on the Riders. According to defense counsel, if Chavez began investigating the Riders after the complaint, it could show Chavez was motivated to investigate the Riders for personal reasons rather than his duties as a CDCR investigator. The prosecutor argued Chavez's motive to investigate the Riders was not relevant to the veracity of his testimony or the evidence he discovered.

The trial court excluded the matter under Evidence Code section 352, finding the testimony tangential and speculative, and requiring an undue consumption of time. The trial court stated: "I find this tangential. It has to do with [Chavez's] relationship with Vasquez and not [Potter and Kons], and there [were] no sustained complaints. He did not get disciplined; so

22

you can't say he's angry because he got disciplined.  You don't know the details of it.  And the fact that he's having an affair with another woman is irrelevant.  If he had been disciplined and you can argue that, you know, that will be a motive for him to lie. [¶]  But, frankly, it's not about Vasquez.  Vasquez is simply a witness the defense has brought.  It's about [Potter and Kons], and there's no bias that appears to be . . . individual[ ] against these two [defendants]."  The trial court further explained, by Potter's counsel's own admission, he had already thoroughly impeached Chavez.  Thus, the probative value of any further impeachment did not greatly outweigh the prejudice.

## B.    Governing law and standard of review

Cross-examination may be used to elicit evidence of a witness's bias or prejudice.  (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1054.)  " 'Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.  Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness,' including by 'cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness.' [Citation.]  'The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." ' "  (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1050–1051, quoting *Davis v. Alaska* (1974) 415 U.S. 308, 316, italics omitted.)

23

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 (*Van Arsdall*).)

"Trial judges retain 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citations.] A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

We review the trial court's decision to admit or exclude evidence for harmless error. (*People v. Snow* (2003) 30 Cal.4th 43, 90; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) We will only find an error prejudicial if, after an examination of the entire record, we conclude it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson,* at p. 836.) However, Confrontation Clause errors are subject to the higher standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully

24

realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." (*Van Arsdall*, *supra*, 475 U.S. at p. 684, citing *Chapman*, at p. 24.)

### C.    Analysis

Here, even assuming the trial court erred and abused its discretion in limiting Potter's cross-examination of Chavez, we find the error harmless under the more demanding standard articulated in *Chapman*.  Even if Potter realized the full potential of his cross-examination of Chavez, we are confident the error was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, 386 U.S. at p. 24.)

While there is no question Chavez's testimony was helpful to the prosecution's case, he was only one of several gang experts called by the prosecution, each of whom testified extensively regarding the Riders and Vasquez's position and influence within the gang.  Nor was Chavez the only witness who testified as to Potter's position and authority within the gang, or his leadership role in the conspiracy to murder Diaz.

For example, Witness Number Five was a former Riders member and was directly involved in the conspiracy and attempted murder.  He explained that Vasquez was the leader of the Riders and Potter was Vasquez's "right-hand man."  He was

25

with Potter when he received the note stating Diaz could be on the yard with the Riders, spoke on the phone with Potter and Vasquez when they discussed the planned attack on Diaz, and was ordered by Vasquez and Potter to attack Diaz. He was also present at the meeting where Potter and the other Riders planned the attack, and where Potter stated Diaz "was no good," and "gots [*sic*]to go." Then, on the day of the attack, Potter instructed Witness Number Five how to assault Diaz, and actually gave Witness Number Five the signal to attack.

Similarly, Terry Gonzales, Jr., an ex-Rider and Vasquez's former right-hand man, testified how he worked with Vasquez to organize the gang by helping to create its rules and regulations. He also described how he committed crimes at Vasquez's direction, including prior attempts to murder Diaz, and how Riders members would receive orders from Vasquez via written notes.

This additional testimony notwithstanding, there was also evidence of the phone call in which Potter and his coconspirators discussed the plan to murder Diaz on Vasquez's orders. Potter was also recorded on multiple phone calls discussing Diaz and attempting to relay a message to Vasquez that the attack had indeed occurred. In one recorded call after the attack, Potter tried to relay the message to Vasquez that Diaz had been "taken care of" and had suffered life-threatening injuries.

There was also ample documentary evidence for the jury to infer Vasquez wanted Diaz murdered for forming the Nuestra Cosas, including writings by Vasquez that splinter factions would be dealt with using extreme violence and would be slaughtered. There was also a hit list with Diaz's name, and other documents

26

detailing Vasquez's anger towards Diaz for forming a splinter faction.

While Potter argues Chavez helped the jury interpret this evidence making Chavez's credibility relevant to Potter's defense, the recordings and documents spoke for themselves and would have been admitted regardless of any limitations placed on Chavez's cross-examination. For example, the recorded calls clearly show a plot, in which Potter played a vital role, to lure Diaz to Corcoran to try to murder him. We find further impeachment of Chavez would not have left the jury with a different impression of the various recorded calls or documents introduced as part of his testimony or their plain meaning.

Potter also argues Chavez's testimony was critical to the prosecution's theory that the plan was to murder Diaz, rather than merely assault him. While Chavez's testimony supported this inference, there was additional, arguably stronger evidence to support that conclusion. This included the nature of the attack and wounds sustained by Diaz, specifically, a stab wound to the base of Diaz's skull and neck with a metal ice pick. Moreover, Witness Number Five testified his orders were to kill Diaz.

Thus, although Chavez played a prominent role in the prosecution's case, his contribution was not so significant that a fully realized cross-examination or additional impeachment would have altered the outcome. (*Van Arsdall*, *supra*, 475 U.S. at p. 684.)

## II. Whether the trial court erred in admitting a hearsay statement that Vasquez ordered the murder of another inmate

Potter next argues the trial court erred by allowing Terry Gonzales, a former Rider, to testify regarding a hearsay

27

statement that Vasquez had ordered Gonzales's murder. Potter contends admission of the statement was severely prejudicial as its only relevance was the truth that Vasquez had issued a kill order similar to the order to kill Diaz here.

### A.    Additional background

Gonzales testified for the prosecution. Gonzales became a Rider in 2003. As a Rider, Gonzales assaulted other inmates on behalf of the gang, taught other members how to kill, and ordered murders of the gang's enemies. Gonzales was Vasquez's "vice-president" and "right-hand man," and he admitted to attempting to murder Diaz multiple times on Vasquez's orders. Tired of gang politics, Gonzales left the Riders in 2017 despite Vasquez's threats to murder him if he left the gang.

When asked if he had any indication he had been targeted for murder, Gonzales testified a CDCR staff member had shown him a note that said " '[Vasquez] put an order to kill you.' " Potter's counsel objected to the statement on hearsay grounds. The prosecutor explained the testimony was being offered for Gonzales's state of mind. The trial court overruled the objection and instructed the jury that the statement was not being offered for the truth of the matter but why Gonzales believed what he believed.

Gonzales went on to testify that he was nearly stabbed to death by two Riders in October 2020. In describing the circumstances that led up to the stabbing, Gonzales testified Witness Number Five came to his cell and appeared to have a concealed weapon. Gonzales suspected Witness Number Five was going to try to kill him based on the CDCR staff member's note and Witness Number Five's strange behavior. Several days later, the Riders attacked Gonzales while he was in the shower.

28

His attackers stabbed Gonzales numerous times while one of them yelled out, "Riders, motherfucker."

In addition, Witness Number Five testified Vasquez ordered him to kill Gonzales because Gonzales was disloyal and was a snitch. He also described his interaction with Gonzales.

### B. Standard of review and governing law

"Hearsay may be briefly understood as an out-of-court statement offered for the truth of its content. Evidence Code section 1200, subdivision (a) formally defines hearsay as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' A 'statement' is 'oral or written verbal expression' or the 'nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression.' " (*People v. Sanchez* (2016) 63 Cal.4th 665, 674.) "Hearsay is generally inadmissible unless it falls under an exception." (*Ibid*.; Evid. Code, § 1200, subd. (b).)

Exceptions to the hearsay rule include when a statement is offered to prove the declarant's state of mind (*People v. Cash* (2002) 28 Cal.4th 703, 727) or to show its effect on the listener (*People v. Ramirez* (2022) 13 Cal.5th 997, 1115). However, even if these exceptions apply, the offered statement must still be relevant and not unduly prejudicial. (See *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.)

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Morales* (2020) 10 Cal.5th 76, 97.) "A judgment may be reversed on appeal for improper admission of evidence only if 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' [Citations.] Reasonably

29

probable in this context 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' [Citation.] In assessing prejudice, we consider both the magnitude of the error and the closeness of the case." (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041, italics omitted.)

### C.    Analysis

Here, even assuming the statement should have been excluded as hearsay without exception and because it was irrelevant to any issue in dispute, we find the error harmless as it is not reasonably probable Potter would have achieved a more favorable result absent the error. (*Watson*, *supra*, 46 Cal.2d at pp. 836–837.)

As an initial matter, we note there is no indication the jury used the evidence for an improper purpose. The trial court gave a specific limiting instruction during Gonzales's testimony regarding the CDCR staff member's note. The trial court instructed the jury, "Ladies and gentlemen, with respect to the statements that were made to this witness, they're not being offered for the truth of the matter but why this witness believes what he believes." We presume the jury followed this instruction. (*People v. Winbush* (2017) 2 Cal.5th 402, 457.)

But even assuming the jury disregarded the limiting instruction or that the instruction was incorrect, the hearsay statement was only a fraction of the evidence that Vasquez and the Riders targeted Gonzales for murder. This included Vasquez's threat to kill Gonzales if he left the gang. Further, there was evidence of a letter authored by Vasquez, informing other Riders that Gonzales had a "warrant for his arrest." Vasquez himself explained that this meant the person would be assaulted "or worse." Other witnesses also confirmed that "or

30

worse" meant murder. Witness Number Five also testified Vasquez ordered him to kill Gonzales. In addition, Gonzales detailed the attempt on his life, when he was stabbed in the shower as an attacker yelled, "Riders," which is more prejudicial than the hearsay statement. The circumstances of the stabbing combined with the other evidence of Vasquez's position and authority within the gang are sufficient to preclude Potter from establishing prejudicial error.

Thus, we find it not reasonably probable the admission of the hearsay statement had any material effect on the outcome of the case. (*Watson*, *supra*, 46 Cal.2d at pp. 836–837.)

## III. The trial court properly limited cross-examination on the topic of Gonzales's motivation for attacking another inmate

Potter also argues the trial court erred by limiting his cross-examination of Gonzales on whether an attack Gonzales committed on another inmate was due to a financial dispute or whether it was on behalf of the Riders and on Vasquez's orders. Potter argues the trial court should have allowed this line of questioning over the prosecution's Evidence Code section 352 objection. By limiting his cross-examination, Potter argues the trial court violated his Confrontation Clause rights.

### A. Additional background

On direct examination, Gonzales testified that he attacked and tried to murder X-Raided, another inmate who published rap music from prison. Gonzales explained that the attack on X-Raided was carried out with other Riders and on Vasquez's orders. Potter's counsel sought to cross-examine Gonzales on this point, explaining he had a good faith belief Gonzales attacked X-Raided over a financial dispute between Gonzales's cell mate and

31

X-Raided over X-Raided's music publishing business. Potter's counsel explained the testimony was relevant to one of the gang enhancement predicates and to impeach Gonzales.

The prosecution objected to this line of questioning under Evidence Code section 352. The prosecution argued Potter's counsel had the opportunity to explore this theory and did not have a good faith basis to cross-examine Gonzales further after Gonzales denied the attack was motivated by a financial dispute unrelated to the Riders. The prosecutor further explained if Potter's counsel did not have a good faith basis to pursue this theory, the questions would be improperly left before the jury without any evidentiary support. In response, Potter's counsel offered Vasquez's anticipated testimony that the Riders had nothing to do with the attack on X-Raided and Gonzales had been kicked out of the Riders for participating in the attack.

The trial court sustained the objection, finding Potter's counsel lacked a good faith belief to pose any questions regarding his alternative theory for Gonzales's motivation to attack X-Raided after he denied the attack was financially motivated or involved a dispute with Gonzales's cell mate. The trial court also noted that while Vasquez could testify that the attack was not committed for the Riders, he would have no knowledge as to whether the attack was carried out for some other reason. Further, Potter's counsel lacked a good faith belief that Gonzales was kicked out of the Riders for the attack on X-Raided because Gonzales left the gang years after the attack.

Later, when Vasquez testified for the defense, he claimed the attack on X-Raided had nothing to do with the Riders, but said that Gonzales was kicked out of the gang for being a snitch.

**B.	Standard of review and governing law**

As we have already stated the standard and governing law for reviewing Confrontation Clause errors, we do not restate them here.

A defendant's broad Confrontation Clause rights notwithstanding, he or she must still have a good faith basis for asking a question on cross-examination when attacking a witness's credibility. (*People v. Pearson* (2013) 56 Cal.4th 393, 433–434.) Thus, a trial court may properly preclude any questions that lack a good faith basis and invite jury speculation on claims that would not be given any evidentiary support. (*People v. Lomax* (2010) 49 Cal.4th 530, 580.) In other words, counsel " 'may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1186.)

We review a trial court's limitation of cross-examination for abuse of discretion. (*People v. Royal* (2019) 43 Cal.App.5th 121, 149; see *People v. Ledesma*, *supra*, 39 Cal.4th at p.705.) As stated above, we review Confrontation Clause errors under *Chapman*. (*Van Arsdall*, *supra*, 475 U.S. at p. 684.)

**C.	Analysis**

Here, we find no abuse of discretion as the trial court properly limited the cross-examination of Gonzales regarding whether the attack on X-Raided was financially motivated or whether Gonzales was kicked out of the Riders for participating in the attack. After Gonzales denied the attack on X-Raided was due to a financial dispute between Gonzales's cell mate and X-Raided, Potter's counsel had no basis to inquire further as there was no other evidence, either through Gonzales's or Vasquez's testimony, of a financial motivation for the attack. This is

33

because, even if Vasquez testified that the attack was unrelated to the Riders, Vasquez knew nothing regarding whether the attack was financially motivated or related to Gonzales's cell mate. Thus, as the trial court correctly found, any further questioning on the topic would have invited jury speculation on claims that had no evidentiary support. (See *People v. Lomax*, *supra*, 49 Cal.4th at pp. 578–580.) Likewise, there was no evidence that Gonzales was pushed out of the Riders for participating in the attack since he left the Riders years later. Indeed, Vasquez testified Gonzales was pushed out of the gang for snitching. Accordingly, the trial court did not abuse its discretion in limiting the cross-examination of Gonzales.

## IV. Whether the evidence was insufficient to support the gang enhancements

Potter argues the evidence was insufficient to support the gang allegations and the jury's true finding should be reversed. While the People agree the evidence was insufficient, they contend that the prosecution should be given the opportunity to retry the gang allegations. We agree with the People.

### A. Additional background

The amended information alleged each count was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1)(C).) The three predicate acts offered to support a pattern of gang activity were: (1) Gonzales's 2010 attack on X-Raided; (2) a December 2017 fight between several Riders and a rival gang member; and (3) a 2020 conspiracy to attack and murder Gonzales.

34

The jury was instructed that a "criminal street gang" is: "[A]ny ongoing, organized association or group of three or more persons, whether formal or informal:  [¶]  1. That has a common name or common identifying sign or symbol; [¶] 2. That has, as one or more or its primary activities, the commission of Assault by Means Likely to Produce Great Bodily Injury . . .  or Conspiracy to Commit Murder . . . ; [¶] AND [¶] 3. Whose members collectively engage in or have engaged in a pattern of criminal gang activity."

The jury was instructed that a "pattern of criminal gang activity" is defined as:  "1. The commission of, attempted commission of, or conspiracy to commit: [¶] any combination or two or more of the following crimes:  Assault by Means Likely to Produce Great Bodily Injury . . .  or Conspiracy to Commit Murder . . . ; [¶] 2. At least one of those crimes was committed within three [years] of [the] prior offense; [¶] 3. The most recent crime occurred within three years of the date the current offense is alleged to have been committed; [¶] 4. The crimes were committed on separate occasions, or by two or more members; [¶] 5. The offenses commonly benefitted a criminal street gang; [¶] AND [¶] 6. The common benefit of the offenses is more than reputational."

## B.    Standard of review and governing law

To evaluate whether a section 186.22 enhancement was supported by sufficient evidence, we review the entire record and determine whether evidence is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)

35

To prove a section 186.22 enhancement, the prosecution must show: (1) the underlying felony must be committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the felony must be committed with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Perez* (2017) 18 Cal.App.5th 598, 606–607.)

Effective January 1, 2022, AB 333 amended the elements for establishing the existence of a "criminal street gang" and "a pattern of criminal gang activity." (Stats. 2021, ch. 699.) It modified the definition of "criminal street gang" to "an ongoing, organized association or group of three or more persons, whether formal or informal," whose members "collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), as amended by Stats. 2021, ch. 699, § 3.) Under AB 333, to demonstrate a pattern of criminal gang activity, a "pattern of criminal gang activity" means "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).)

C.   **Analysis**

AB 333 became effective January 1, 2022 (Stats. 2021, ch. 699) and the amended information was filed two days later.

36

The amended information appeared to track the outdated elements for gang enhancements in effect prior to AB 333. Consequently, the three predicate acts offered to support a pattern of gang activity were insufficient to support the gang allegation under AB 333, which was in effect at the time of trial. First, the 2010 attack is outside the section 186.22, subdivision (e)(1)'s time limitations. Second, the conspiracy to murder Gonzales occurred after the attack on Diaz. Offenses committed after the charged offense cannot qualify as a predicate offense. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458.) The only remaining predicate is a 2017 fight, which, on its own, is insufficient to support the gang enhancement. Thus, the jury's true finding on the gang enhancement is reversed for insufficient evidence.

Because we are reversing the gang enhancement, we must decide whether retrial of the gang allegations is barred on remand. On the one hand, Potter argues retrial is barred based on double jeopardy principles because we are reversing for insufficient evidence under the law as it was in effect at the time. On the other hand, the Attorney General asserts double jeopardy principles do not bar retrial because, even if Potter were convicted on retrial, he would not be exposed to greater punishment. As the Attorney General explains, since Potter is already subject to a sentence of 50 years to life, a true finding on the gang allegations would not expose him to a greater punishment. While the disagreement appears to be merely academic and a retrial would serve no practical purpose, we agree with the Attorney General.

"The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15 of the

California Constitution guarantee that a person may not be placed twice 'in jeopardy' for the 'same offense.'  [Citation.]  'The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple [punishments] for the same offense.' " (*People v. Seel* (2004) 34 Cal.4th 535, 541–542 (*Seel*).)

"An 'appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal.'  [Citation.]  Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial." (*McDaniel v. Brown* (2010) 558 U.S. 120, 131.)

Our own Supreme Court has held any factual allegation that constitutes an element of the offense, including sentence enhancement allegations, may not be retried following the equivalent of an acquittal.  (*Seel*, *supra*, 34 Cal.4th at pp. 548–549.)  However, our Supreme Court subsequently held that this does not apply to a section 186.22 enhancement if the underlying crime was for first degree murder, which is punishable by death, imprisonment for life without the possibility of parole, or by a prison term of 25 years to life.  (*People v. Nunez* (2013) 57 Cal.4th 1, 39, fn. 6.)  In that scenario, because the gang enhancement subjects the defendant to a 15–year mandatory minimum parole eligibility term, a section 186.22 enhancement will not increase the punishment for the crime.  (*People v. Nunez*, at p. 39, fn. 6.)

Since Potter is currently subject to a sentence of 50 years to life, retrial of the gang allegations would not increase the punishment for the offenses here.  Therefore, although a

conviction on retrial would have no practical effect, the prosecution is not barred from retrying the gang allegations.

The cases cited by Potter do not persuade us otherwise. In each of those cases where the reviewing court remanded the matter without giving the prosecution another opportunity to retry the gang allegations, the defendants committed less serious offenses and a conviction on the gang enhancements on retrial would have increased the defendants' sentences beyond the statutory minimum or the statutory maximum. (See, e.g., *People v. Garcia* (2014) 224 Cal.App.4th 519, 525–526 [gang enhancement would add five years to defendant's sentence for shooting a firearm in a grossly negligent manner]; *People v. Renteria* (2022) 13 Cal.5th 951, 970 [gang enhancement would require an indeterminate sentence for shooting at an inhabited dwelling].)

Accordingly, although retrial on the gang allegations would serve little purpose as Potter has already been sentenced to 50 years to life, the prosecution is not barred from retrying the allegations.

V. **Whether the trial court erred in applying the 10-year enhancement under section 186.22, subdivision (b)(1) instead of the 15-year minimum parole date enhancement**

Although we are reversing the jury's true finding on the gang allegations for insufficient evidence, because we are giving the prosecution the opportunity to retry those allegations on remand, we find it necessary to address Potter's final argument that the trial court erred in imposing the 10-year enhancement under section 186.22, subdivision, (b)(1)(C).

39

On count 1, the trial court sentenced Potter to a base term of 25 years to life, doubled to 50 years to life pursuant to the Three Strikes law, plus 10 years for the gang allegation.  Where, as here, gang allegations under section 186.22, subdivision (b), are found true by the jury and the underlying felony already carries a life sentence, "section 186.22, subdivision (b)(5) . . . applies and imposes a minimum term of 15 years before the defendant may be considered for parole."  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)

Accordingly, the additional 10 years imposed by the trial court on count 1 was unauthorized.  In the unlikely event Potter is retried and the gang allegation is found true, the trial court may only set the minimum parole eligibility date of 15 years under section 186.22, subdivision (b)(5).

## DISPOSITION

The gang enhancements are reversed and the matter is remanded to the trial court to afford the prosecution an opportunity to retry the gang allegations.  Accordingly, the additional 10 year sentence imposed under section 186.22 is also reversed.  In all other respects, the judgment is affirmed.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.

40